IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:23-CR-156 |
| v. | Hon. Rossie D. Alston Jr. |
| DANIEL MARC LOFARO, | Sentencing: July 24, 2024 |
| *Defendant* | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The defendant has the unique distinction of having committed nearly every federal child exploitation offense over the last decade; first, he was a collector of images and videos depicting the sexual abuse of children, including the rape of a toddler and prepubescent children.  Second, he was a prolific distributor of child sexual abuse material (CSAM) on social media, spreading the images and videos to countless other pedophiles on the Internet, who no doubt continued to perpetuate their dissemination.  And finally, he directly victimized two young girls, one of whom he groomed online to entice her to masturbate with him and send him child pornography, and the other he used to produce videos of her engaged in sexually explicit conduct, which he saved to his cell phone so he could view them whenever he liked.  The defendant committed these crimes all while purporting to be a model government employee, teacher, loving son, and husband.

The defendant now comes before the Court for sentencing after having pleaded guilty to coercion and enticement of a minor, Minor 1, in violation of 18 U.S.C. § 2242(b) (Count 1), distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Count 2), receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Count 3), possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Count 4),

and having stipulated to the sexual exploitation of Minor 2.  The applicable Guidelines range has been correctly calculated in the Presentence Report ("PSR") as Life.  *See* Docket Entry 68 ("PSR") at ¶ 135.  For the reasons below, the United States respectfully recommends the Court impose a sentence of 30 years in prison, which is sufficient but not greater than necessary to reflect the totality of the defendant's conduct and comport with the purposes of sentencing set forth in 18 U.S.C. § 3553.

## BACKGROUND

### I.    Factual Background

The factual background of this case is set forth in detail in the PSR and Statement of Facts and is incorporated herein by reference.  *See* PSR ¶¶ 16-44.  As such, the facts and procedural history are summarized here only in relevant part.

### A.  The defendant coerced and enticed a 12-year-old girl, Minor 1, to engage in masturbation and send him child sexual abuse material.

The defendant groomed Minor 1 and lied to her for his sexual gratification. Between November 7, 2021, and November 12, 2021, the defendant engaged in a sexual chat with Minor 1, who was then 12 years old, on an Internet-based social media application ("Application A"). PSR ¶ 22.  During their chat, Minor 1 told the defendant she was 15 years old, and the defendant told Minor 1 he was 22 years old, though in truth he was actually 37.  *Id*. at ¶ 23.  The defendant told Minor 1 she was "young" and asked her if she had been with a man before.  *Id.*  Over 5 days, the defendant repeatedly initiated conversation with Minor 1.  On November 11, 2021, the defendant asked Minor 1 if she shaved and went on to tell her in graphic detail how he would have sex with her.  *Id.* at ¶ 24.  The defendant described how he would kiss the inside of Minor 1's legs, "push [her] panties to the left" "see [her] beautiful pussy" and "lick the little bean at the top[.]"  *Id.*  The defendant told Minor 1 that he would put his finger in her vagina and lick "[her]

2

clit." *Id.*  Then, the defendant asked, "Has anyone ever done that to you?" *Id.*  The defendant

described penetrating Minor 1 with his penis, and when she did not respond, asked her "Do you

have anything to add?" *Id*.  While the defendant laid out in detail his sexual fantasy, Minor 1

only provided five responses, four of which were "…"  The defendant continued to entice and

exploit Minor 1 even when she hardly responded.

     After the defendant sent these messages to Minor 1, he asked her "Can you send a pick of

your pussy?" "I want to see what I just came in."  PSR ¶ 25.  A few minutes later, the defendant

said to Minor 1, "Now let's take off those pants" "And let's masterbate [sic] together[.]" *Id.*

When Minor 1 did not respond, the defendant wrote, "Well let's do it another day then." *Id*.

Later that same day, the defendant told Minor 1 he wished they could video chat and asked her if

they could audio chat. *Id.*  Approximately 4 hours later, the defendant sent Minor 1 a message:

"You naked now?" *Id.*  The following day, the defendant messaged Minor 1 again and asked her

"Want to get naked together?" *Id*. at ¶ 26.

**B.  The defendant sexually exploited a minor girl, Minor 2, to obtain child sexual abuse material of her.**

     The defendant escalated his conduct with a 14-year-old girl, Minor 2, even asking to meet

with her in person.  The defendant connected with Minor 2 in 2019 through an online dating

application.  PSR ¶ 29.  The defendant chatted with Minor 2 on various social media and

messaging applications, including Application A, and had voice and video calls with her. *Id*.  In

his messages to Minor 2, the defendant called himself "Jeff" and used the username jeffg2007 on

Application A. *See* Exhibit A at 2; Exhibit B (Application A messages between the defendant

and Minor 2).  On multiple occasions, the defendant asked Minor 2 to send him sexually explicit

pictures and videos of herself.  PSR ¶ 29.  In or around February 2022, at the defendant's

request, Minor 2 (then 17 years old) created a sexually explicit video of herself masturbating

with an object. *Id.* Minor 2 sent this video to the defendant via Application A. *Id.* The defendant then screen-recorded the video from Application A and saved the screen recording to his iPhone 12 mini. *Id.* The defendant last reached out to Minor 2 on May 18, 2022 (*i.e.*, the morning of the residential search warrant), via Application A. *See* Exhibit B at 3.

In early 2023, Minor 2 suffered a traumatic brain injury as a result of a motor vehicle crash. *See* Exhibit A at 1. Consequently, she could not be interviewed initially, though she recovered enough to be interviewed in February 2024. During her interview, Minor 2 told law enforcement that the defendant asked for her address so he could visit her. *Id.* Additionally, Minor 2 told law enforcement that she stopped talking to the defendant because he was asking her to send him photographs of herself every day, even when she was at school. *Id.* at 2.

**C.  The defendant collected child sexual abuse material for nearly a decade.**

The defendant collected approximately 600 child pornography images and videos on two laptops. PSR ¶ 38. The defendant saved nearly 500 child pornography files in an encrypted zip file on his MacBook Air laptop (SN C02JC1B3DRV9). *Id.* at ¶ 39. Within this file, the defendant saved approximately 400 images and 72 videos depicting child pornography. *Id.* For example, the defendant had a 1-minute and 53-second video, titled in part "baby girl gets covered on cum" which depicts an adult man penetrating the anus of an infant/toddler and ejaculating. *Id.* The defendant had another video, titled in part "showered in cum" which depicts an adult man masturbating and ejaculating on the stomach of an infant, who can be heard whimpering during the ordeal.

Forensic review of the MacBook Air laptop also revealed a list of recently played files in QuickTime Player[1]. *See* Exhibit C at 4. Some of the child pornography file names from the encrypted zip file, including "13yo creamy pussy" appeared in the list of files played recently in QuickTime. *Id*.

The defendant also saved over 100 child pornography videos to his Apple MacBook Pro laptop (SN C02VJ1RNG8WL). PSR ¶ 40. One of the videos on this device depicts two nude prepubescent children engaged in sex. *Id.* The Last written and Created time stamps associated with the videos range from July 10, 2014 to November 10, 2020. *See* Exhibit D at 3. Forensic examination of this device also revealed Internet browsing history under the defendant's user account. *Id.* at 4. The history records show that more than 750 files were downloaded from a particular website to /Users/lofaro/Downloads between September 7, 2019 and November 9, 2019. *Id*. The file names included files, named in part, "super cute boy jerks" "10yo girl in socks pee" "prettiest preteen butthole" and "11YO and Uncle Anal Fuck[.]" *Id*.

**D. The defendant extensively traded child sexual abuse material with other pedophiles online.**

The defendant perpetuated the growing market for child pornography through his distribution and receipt of CSAM. Between at least August 2021 and February 2022, the defendant distributed and received numerous CSAM files on an Internet-based social media application ("Application B"). PSR ¶ 30. The defendant was a member of multiple groups on Application B dedicated to discussing sexual abuse of children and exchanging child pornography. *Id*. at ¶ 31; *see also* Exhibit N (list of groups of which the defendant was a

---

[1] QuickTime Player is a multimedia player and screen recording application developed by Apple Inc. for macOS operating systems. It can be used to play audio and video files, and to capture and edit screen recordings.

member).  Typically, the defendant followed the group chat and then connected with certain members of the group via direct message for the purpose of trading child pornography more discreetly.  PSR ¶ 31.  For example, on October 20, 2021, the defendant participated in a group with "cuties" in the title.  A member of the group ("User l") posted three files to the group chat. *Id.* at ¶ 32.  Approximately 10 seconds later, the defendant sent User 1 a direct message, telling him "Love what you just posted. You have any a bit more ... revealing?"  *Id.*  User 1 sent the defendant two files, and the defendant asked if User 1 had "Any penetration?"  *Id.* Approximately 30 minutes later, User 1 sent the defendant a 27-second video depicting two topless minor females kissing on a bed while an adult man ejaculates on their faces.  *Id.*

On August 13, 2021, the defendant exchanged direct messages with a member of a group with "inces" in the title.  PSR ¶ 33.  In the direct message, the defendant told the other user (User 2): "S2r" and "Incest and family btw[.]"  *Id.*  User 2 sent the defendant a 20-second video depicting penile penetration of a minor female's vagina.  *Id.*  Shortly thereafter, the defendant sent User 2 a 10-second video depicting a naked adult female holding an infant/toddler while engaged in sex with an adult man.  *Id.*

On December 27, 2021, the defendant participated in a group with a group name indicative of child pornography.  PSR ¶ 34.  The defendant started a direct message with one of the group's participants, "User 3."  *Id*.  The defendant asked User 3 "what you trade?"  *Id.*  User 3 sent the defendant a media file and the defendant said he was "Looking for more ... realistic[.]" *Id.*  User 3 sent the defendant a video depicting an adult male who is shown inserting his erect penis into a prepubescent minor female's mouth and pulling it in and out for the duration of the video.  *Id.*  The defendant then sent the same video to another Application B user.  *Id.* Approximately 30 minutes later, the defendant asked User 3 "You got any penetration ones?"

6

*Id.* Two minutes later, in a separate direct message with a different user, the defendant asked that user "You got any penetration?" *Id.* The defendant asked User 3 if he had "lil with a dog or another animal" or "maybe brother sister[.]" *Id.* Also on this date, the defendant chatted with another Application B user about that user's experience sexually assaulting 6 and 7 year old girls in Thailand. The user told the defendant "[t]he 6 and 7 year olds you can put your hand between their legs they don't know what you doing but you can feel their Pusey lips through their panties[.]" *Id.* The defendant told the user that he was a "lucky man" and now the defendants "want[s] to go to Thailand[.]" *Id.*

The defendant frequently discussed his sexual interest in children with other Application B users. He also frequently discussed sexual abuse of children in real life. For example, on February 5, 2022, the defendant chatted with User 4 about his sexual abuse of his 12-year-old niece while she slept. PSR ¶ 35. The defendant told User 4, "Good that she let you finger get" and "I would love to try one day[.]" *Id.* The defendant also told User 4 that he was "looking for someone who has a daughter that they are willing to share" and he "met someone once that seemed to be willing but they fizzled out." *Id.* at ¶ 36.

On certain days between August 2021 and February 2022, the defendant exchanged as many as 46 child pornography files with other Application B users. PSR ¶ 37.

**E.  The defendant attempted to avoid law enforcement detection.**

The defendant was aware that his conduct was illegal, and he took steps to avoid law enforcement detection. For example, the defendant periodically deleted his child pornography and then solicited new child pornography from Application B users so he could rebuild his collection. *See* PSR ¶ 35; Exhibit E. In addition, the defendant would not trade child pornography in the group chat; instead, he advised other users to only trade in direct messages.

7

*See* Exhibit F.  In November 2021, the defendant chatted with another Application B user about meeting a minor in real life.  *See* Exhibit G.  The other user asked the defendant "What's the age in PA?" and the defendant replied, "16."  *Id.*  The other user suggested "Other countries" and the defendant replied, "Well you don't want to go to other countries" "Because US law will follow when you return" and "Not all laws follow but that one does[.]" *Id*.  In February 2022, the defendant told an Application B user looking for CSAM to "ask people in their dm" and "Be discreet about it[.]"  *See* Exhibit H.

## II.     Procedural History

On December 7, 2023, a federal grand jury in the Eastern District of Virginia returned a four-count Superseding Indictment charging the defendant with coercion and enticement, in violation of 18 U.S.C. § 2242(b) (Count 1), distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Count 2), receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Count 3), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Count 4).  *See* DE 33.  On May 1, 2024, the defendant entered guilty pleas to all four counts of the Superseding Indictment pursuant to a plea agreement.  *See* DE 63. A sentencing hearing was scheduled for July 24, 2024.

## SENTENCING ANALYSIS

## I.     Statutory Penalties and Guidelines Calculations

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines."  *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."  *Id*.  Those factors include the nature and circumstances of the offense,

the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a).

Although the guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the Court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities."  *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citations omitted).  Indeed, in the ordinary case, there will be a significant amount of overlap between the guidelines range and the remaining § 3553(a) factors, because the guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives."  *Rita v. United States*, 551 U.S. 338, 350 (2007).  Thus, although the guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Ultimately, the sentence imposed must meet a standard of reasonableness.  *See Booker*, 543 U.S. at 260-61.

The U.S. Probation Office prepared a PSR containing the defendant's Guidelines calculation.  As explained in the PSR, in addition to the counts of conviction for the defendant's coercion and enticement of Minor 1, and his distribution, receipt, and possession of child pornography, he also stipulated to the offense of sexual exploitation of Minor 2.  Accordingly, "the guidelines are to be applied as if the defendant had been convicted of an additional count for each of the offenses stipulated." USSG § 1B1.2(c), comment. (n.3).  Therefore, Count Group 1, which includes Minor 2, was correctly calculated as follows:

### Count Group 1 (sexual exploitation of Minor 2, distribution, receipt and possession of child pornography)

| Guideline | |
|---|---|
| Base offense level for a violation of 18 U.S.C. § 2252(a)(2). (USSG § 2G2.2(a)(2)) | 22 |
| The material involved a prepubescent minor or a minor who had not attained the age of 12 years. (USSG § 2G2.2(b)(2)) | +2 |
| The defendant distributed in exchange for any valuable consideration, but not for pecuniary gain. (USSG § 2G2.2(b)(3)(B)) | +5 |
| The offense involved material that portrays sadistic or masochistic conduct or other depictions of violence; and sexual abuse or exploitation of an infant or toddler. (USSG § 2G2.2(b)(4)) | +4 |
| The defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor. (USSG § 2G2.2(b)(5)) | +5 |
| The offense involved the user of a computer or interactive service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material. (USSG § 2G2.2(b)(6)) | +2 |
| The offense involved at least 600 images. (USSG § 2G2.2(b)(7)(D)) | +5 |
| **ADJUSTED OFFENSE LEVEL** | **45** |

PSR ¶¶ 62-72.

Guidelines for Count 1 were correctly calculated as follows:

### Count 1 (coercion and enticement of Minor 1)

| Guideline | |
|---|---|
| The guideline for a violation of 18 U.S.C. § 2422(b) is USSG § 2G1.3. Pursuant to the cross reference at § 2G1.3(c)(1), 2G2.1 is used to determine the offense level because it results in a higher offense level. The base offense level is 32. (USSG §§ 2G2.1(a) and 2G1.3(c)(1)) | 32 |
| The offense involved a minor who had attained the age of 12 years but not attained the age of 16 years. (USSG § 2G2.1(b)(1)(B)) | +2 |

| | |
|---|---|
| For the purpose of producing sexually explicit material, the offense involved (A) the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct. (USSG 2G2.1(b)(6)) | +2 |
| **ADJUSTED OFFENSE LEVEL** | **36** |

PSR ¶¶ 73-79.

As explained in the PSR, the combined adjusted offense level is 45. *Id.* at ¶¶ 81, 83. The defendant's combined adjusted offense level, the chapter four enhancement for repeat and dangerous sex offender against minors, and the acceptance of responsibility credits results in an offense level of 47. *Id.* at ¶¶ 83-86. Pursuant to USSG Chapter 5, Part A, comment. (n. 2), "[a]n offense level of more than 43 is to be treated as an offense level of 43." Therefore, based on a total offense level of 43 and a Criminal History Category I, the defendant's Guidelines range is Life. *Id.* at ¶¶ 90, 135. The defendant has not submitted any objections to the Guidelines calculation.

## II.    Section 3553(a) Factors

The United States believes that a sentence of 30 years' imprisonment and a lifetime term of supervised release is sufficient but not greater than necessary to reflect the totality of the defendant's conduct and comport with the purposes of sentencing set forth in 18 U.S.C. § 3553.

### A. The nature, circumstances, and seriousness of the defendant's offense

The defendant's criminal conduct is extremely serious and demands an appropriately severe sentence.

For years, the defendant treated the depictions of child sexual abuse like they were baseball cards, collecting them and trading them for more valuable material, *i.e.*, material that was more abusive, involved more penetration, and included acts of bestiality. *See* Exhibit I

("You have any young with animals?" "Shame. It is hard come cum by" and "really looking for that with beast"); Exhibit J ("Can you send one or two young penetration vids …. I have an itch I need to scratch"); Exhibit K ("I like Asian if father daughter" "That and dog daughter" "But that is hard to find").  On February 9, 2022, the defendant traded CSAM with multiple different Application B users at the same time (this was not unusual for him).  *See* Exhibit L.  At 13:03, the defendant asked another user if he wanted "one that is a little out of your preferred age[.]"  The other user replied, "I'll try anything lol[.]"  The defendant sent him a 12 second video depicting two adult men sexually abusing a very small prepubescent girl.  The video shows the girl on all fours while one man penetrates her from behind and the other man inserts his penis in her mouth.  The other user wrote, "Jesus. She's tiny lol[.]"  Then, the defendant asked a different user if he had "any little boy little girl or boy mom[.]"  The user replied, "Actually yes I do" and sent the defendant a 1-minute and 13-second video depicting a little girl, who appears to be approximately 4 or 5 years old, lying naked on a bed.  The video shows an adult man attempt to insert his penis in her vagina and then ejaculate on her.  After he ejaculates, he touches the little girl's vagina and manipulates her genitals.  The little girl can be heard crying while she is being assaulted.  The video also shows a second naked child, who appears to be toddler-aged, sitting next to the bed during the sexual assault.

Through his conduct, the defendant whetted the appetites of other pedophiles online who were eager to collect CSAM and talk to the defendant about his fantasy of abusing his fictional daughter as well as discuss their own experiences sexually abusing defenseless children.  *See e.g.,* Exhibit M.  Ultimately, the chats excerpted in the PSR and in the exhibits attached to this memorandum provide just a brief glimpse of the defendant's involvement in the distribution of CSAM and exploitation of children.  Indeed, the Application B chats described above are pulled

from more than 33,000 lines of chat in the defendant's iPhone, spanning approximately 15 months, and largely dedicated to the discussion and trading of CSAM. The chats reveal not just the defendant's criminal offenses but also his complete indifference to the children who were sexually abused on camera for his sexual gratification.

The defendant showed the same callous disregard to the two young girls he victimized in this case. Minor 1 was 12 years old when the defendant enticed her to masturbate with him and send him child pornography. He told Minor 1 in explicit detail how he would have sex with her and prompted her to contribute to that conversation. He asked her to get naked, to masturbate together and offered to send her a picture of him ejaculating. It is clear from the victim impact statement of Minor 1's mother that the defendant's crime has left a lasting impact on Minor 1 and her family. First, the defendant's exploitation of Minor 1 has hurt her family and made her parents feel that they failed Minor 1 because they could not protect her from the defendant. *See* PSR at 37-40. According to Minor 1's mother, the family has had numerous arguments about the offense and Minor 1 is unable to communicate with her parents about what happened. *Id*. Second, the offense caused Minor 1 to suffer in school, where her "academic performance went into a total decline." Ultimately, it is impossible to know how the offense will continue to impact Minor 1 as she grows up. It is clear, however, that she has been seriously harmed by the defendant's conduct.

The defendant's victimization of Minor 2 is also incredibly serious. The defendant first met Minor 2 when she was 14 years old. He groomed her, had sexual communications with her, talked about meeting her in person, and used her to create CSAM of herself, which he saved to his iPhone so he could rewatch the videos whenever he liked. According to Minor 2, he asked for pictures of her constantly, even when she was at school. He even reached out to Minor 2 on

Application A the very morning that law enforcement went to his residence with a federal search warrant.

The harm that the defendant has caused by his conduct is immeasurable. Indeed, children who are victimized through the production of child sexual abuse material (CSAM) "undeniably suffer serious harm when they are used to create this type of material." *United States v. Wellman*, 663 F.3d 224, 232 (4th Cir. 2011). Quite simply, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional, and sexual development in ways which no just or humane society can tolerate." *Kennedy v. Louisiana*, 554 U.S. 407, 468 (2008) (Alito, J., dissenting) (quotation marks omitted).

By trafficking in child pornography, the defendant has also contributed to the demand for CSAM that fuels the child pornography market and the sexual abuse of children. As the Supreme Court has recognized, trafficking in child pornography is "intrinsically related to the sexual abuse of children in at least two ways." *New York v. Ferber*, 458 U.S. 747, 759 (1982). "First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Id.* "Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Id.*

It is important to also highlight the harm to the victims depicted in the defendant's collection of CSAM on his laptops. *See Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come."); *United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.").

14

"Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (citing *Ferber*, 458 U.S. at 759) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children "must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," and they "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-48.

Here, the defendant possessed hundreds of images and videos depicting CSAM, including a video depicting the sexual abuse of "Pia." The video is 44-seconds and depicts an adult man penetrating the vagina of a very small, prepubescent, girl. According to her restitution request, Pia was sexually abused starting when she was just a preschooler. PSR ¶ 50. In a victim impact statement, Pia's mother wrote:

> My child's life has been changed forever. She is very aware of the images and videos that were produced and distributed online. She is aware of the seriousness and vastness of this crime. This crime creates a crippling insecurity in her and makes her worried and extremely upset. The fear consumes her daily. Talking about this crime (the distribution of her abuse images) causes her to feel sick almost to the point of vomiting . . . She is embarrassed and humiliated, knowing that images that portray her in a sexual manner are available for others to see. She is afraid, as am I, that she will be recognized by those who have downloaded the images of her abuse . . . She doesn't want to be defined as a victim, but she cannot escape her victimization, and she can never put it in the past, because it is ongoing.

PSR at 65.

15

The defendant also possessed 3 videos depicting the sexual abuse of "Lily." One of the videos is 43-seconds and depicts a prepubescent girl, who is blindfolded and bound at her hands and legs. The video shows another individual rub an object on the victim's genitals and insert the object in her anus. In her victim impact statement, Lily wrote:

> Knowing that images and videos of my sexual abuse as a child continue to be distributed on the internet causes an unending grief . . . It feels like a part of myself is always caught up in this terrible circulating and painful loop . . . I feel less hope about my own CSAM situation getting better than I did a few years ago, although I still do try to feel hopeful that CSAM issues overall will get better in the future by being less available online and with children being better protected.

PSR at 116.

The defendant possessed 2 videos depicting the sexual abuse of "April." One of these videos is 1-minute and 7-seconds and depicts a prepubescent girl dressed in a cat costume, performing oral sex on an adult man. In her victim impact statement, April wrote:

> As a child I didn't have a choice what happened to me. Now, I have to suffer twice; the first time was being abused and the second time is the ongoing anxiety due to the images of my abuse forever accessible. It's impossible to cope with and accept that I have to live with the images of my abuse being available on the internet indefinitely. These images will live on the internet longer than I will live.

PSR at 47.

The nature and seriousness of the defendant's crimes weigh in favor of a 30-year sentence.

## B. The Defendant's History and Characteristics

Many defendants involved in other federal crimes, such as drugs and guns, have dire family life circumstances that lead them to the all-too-predictable path of crime. The defendant in this case experienced the antithesis of that lifestyle. The defendant grew up with both parents in his home and did not apparently lack for any necessities. The defendant reported a "wonderful

16

relationship" with his mother, though he had grievances regarding his father.[2]  PSR ⁋ 99.  The

defendant received an excellent education, which is extensively detailed in the PSR.  *See id.* at ⁋⁋

112-114.  He attended college, graduate school, and eventually obtained his doctorate.  Prior to

his arrest, he was employed as the science director for the Office of Naval Research Global in

Tokyo, Japan. *Id.* at ⁋ 117.  He has been married since 2016, owns his own home, and has had a

steady income and sufficient financial resources.

Despite his many good fortunes, and his full knowledge of the illegality of his conduct,

he chose repeatedly to break the law and to harm children. He could have used his education to

find ways to battle his sexual interest in children or he could have used his large salary to find

treatment or assistance with combatting his proclivity.  If ever there was a defendant who had the

time, resources, and opportunity to reflect on his choices—of which there were so many—and

stop exploiting minors, this is such a defendant.  Instead, he did nothing but feed his insatiable

desire to harm children.  He was not corralled into these crimes by a series of unfortunate life

circumstances.  Rather, he chose his path knowing what the consequences would be if he were

caught and doing it anyway.  His sentence should reflect those facts.

### C.  Promote respect for the law and provide just punishment

This Court must also consider the need to "promote respect for the law" at sentencing. 18

U.S.C. § 3353(a)(2)(A).  Congress enacted federal criminal laws targeting CSAM offenses to

address ongoing sexual abuse and victimization of children.  S. Rep. 95-438, 5, 1978

U.S.C.C.A.N. 40, 42-43, 56.  But this legislation and its later amendments are more than

---

[2] The defendant reported he never had a close relationship with his father, who forced his children to do things they did not want to do, like attend church, Sunday school, and play sports. PSR ⁋ 98.  The defendant also reported that his father spanked him when he was between 8 and 11 years old.  *Id.*

prophylactic measures.  They reflect value judgments and the accepted moral norms of our society.  As one Senate Judiciary Committee report concluded: "the use of children … as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous."  S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. at 43.  Put differently, the defendant did not just violate federal law, he also transgressed universally recognized moral principles—specifically, the need to protect and nurture children and not to be titillated by depictions of their sexual abuse.  Through his own conduct, the defendant exploited multiple children and helped contribute to the revictimization of many more through the continued trafficking in material depicting their abuse.  He knew what he was doing was both harmful and illegal, and yet he continued doing it anyway.  This Court should craft a sentence that appropriately expresses social condemnation of the defendant's crimes, captures the serious harm he has caused, and promotes respect for the rule of law.  The government's recommended sentence does all three.

### D.  The need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public

Both specific and general deterrence call for a significant sentence in this case.  With respect to specific deterrence, the risk the defendant poses to children is immense.  The defendant has collected CSAM since at least 2014.  He distributed CSAM to numerous individuals online and engaged in many lengthy conversations about the sexual abuse of children in real life.  At some point, his conduct escalated to chatting with minors online and enticing them to engage in sexually explicit acts for his sexual gratification.  As the Supreme Court has noted, there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class."  *Smith v. Doe*, 538 U.S. 84, 103 (2003).  The sentence

imposed must therefore protect the public and account for the specific danger the defendant poses to minors.

Here, a 30-year sentence would adequately protect children from the defendant's future crimes. The defendant is a young man who only needed a cell phone to exploit children and cause potentially lifelong harm. He poses a continuing risk to children anytime he has access to them, including through a phone or a computer. In fact, "[s]tudies and reports in this field are consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat." *United States v. Irey*, 612 F.3d 1160, 1214 (11th Cir. 2010) (citing various studies and reports); *see also United States v. Allison*, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). A sentence of 30 years would protect the most vulnerable members of society—namely, children—from the defendant's conduct.

General deterrence is especially important in cases like this one, where CSAM was distributed in private groups and direct messages on social media and the crimes were difficult to detect—and, indeed, went undetected—until the defendant's messages were discovered in another target's cell phone. It is widely reported that the amount of CSAM online is increasing at an alarming pace. *See e.g.,* Teresa Hyizar, "Child sex abuse content is exploding online. We're losing the fight against it" (available at: https://www.usatoday.com/story/opinion/2023/03/10/how-social-media-emboldens-abusers/11413209002/). And social media platforms, like Application A and Application B, play a big part in the proliferation of CSAM online. *Id*. ("abusers have become more adept at using social media to share files, find like-minded communities and groom potential victims.").

Indeed, NCMEC reported having received 36.2 million cyber tips in 2023 alone, a 12% increase

compared with the previous year.  *See* 2023 CyberTipline REPORT, at 3 (available at:

https://www.missingkids.org/content/dam/missingkids/pdfs/2023-CyberTipline-Report.pdf).

The majority of the reports received were related to the circulation of CSAM.  *Id*.  However,

NCMEC also noted 186,000 reports in 2023 regarding online enticement, a more than 300%

increase from 2021.  *Id*. at 5.  The Report also provides that in 2023 NCMEC continued to see

inconsistencies in reporting from electronic service providers regarding exploitation on their

platforms.  *Id*. at 3.  In sum, social media applications are being used by offenders to disseminate

CSAM and victimize children and these crimes are exploding in number.

 The need for effective deterrence through a serious sentence is essential to make it clear

to offenders, like the defendant, who believe they can hide their crimes in private groups and

direct messages, that the penalties for these crimes are steep.  A sentence of 30 years would

accomplish that aim.

## III. Supervised Release

 The Court must also determine the appropriate term of supervised release at sentencing.

"Supervised release … is not a punishment in lieu of incarceration." *United States v.*

*Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those

served by incarceration."  *United States v. Johnson*, 529 U.S. 53, 59 (2000).  Under 18 U.S.C. §

3583(k), the authorized term of supervised release for the defendant's crimes is at least five years

and up to life.  This five-year mandatory minimum term reflects a heightened concern for

recidivism among sex offenders and the need for supervision over time.  *See* H.R. Rep. No. 107–

527 at 2 (2002) (explaining that "studies have shown that sex offenders are four times more

likely than other violent criminals to recommit their crimes" and that "the recidivism rates do not

appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66 at 49–50 (2003).  Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, U.S.S.G. § 5D1.2(b) (Policy Statement), which courts have observed "reflects the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public."  *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citation omitted).

Based on an assessment of these factors, the United States recommends that the Court impose a lifetime of supervised release with the conditions of supervision described in 18 U.S.C. § 3583(d) for felons required to register under the Sex Offender Registration and Notification Act and those described in U.S.S.G. § 5D1.3(d)(7) for sex offenders.  Given the length of time the defendant has trafficked in child pornography and the seriousness of his conduct in this case, a lifetime term of supervision is appropriate to limit his capacity to reoffend and provide him with steady access to the treatment and monitoring he clearly requires.

## IV.    Special Assessments Under the Justice for Victims of Trafficking Act (JVTA) & the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA)

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act.  The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess . . . not more than $35,000 on any person convicted of [an] offense for trafficking in child pornography."  18 U.S.C. §§ 2259A(a)(2).  As stated above, in this case, the maximum assessment under § 2259A(a) is $35,000.  Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* §§ 2259(d) & 2259B, and shall be paid in full after any special assessment under § 3013 and any restitution to victims of the defendant's offenses, *see* § 2259A(d)(2).  In determining the amount to be assessed under

21

§ 2259A, courts should consider the sentencing factors set forth in § 3553(a) and the guidance in § 3572 for the imposition of fines. § 2259A(c).  The United States respectfully requests that the Court impose a reasonable special assessment under § 2259A, in addition to the $400 mandatory special assessment for his felony convictions pursuant to 18 U.S.C. § 3013.

Additionally, under the Justice for Victims of Trafficking Act, courts "shall assess an amount of $5,000 on any non-indigent person" convicted of certain enumerated offenses, including sexual exploitation of children.  *See* 18 U.S.C. § 3014.  As detailed in the PSR, the defendant has extensive assets and is clearly able to pay the special assessment.  Accordingly, the United States respectfully requests that the Court impose an assessment of $5,000 per count of conviction pursuant to 18 U.S.C. § 3014.

## V.     Restitution

Pursuant to 18 U.S.C. §§ 2259 and 3663, and the plea agreement, the defendant must "pay every victim the full amount of the victim's losses as determined by the Court," but which is no less than $3,000.  The government has received restitution requests and supporting documentation from 5 victims of the defendant's conduct—namely, victims depicted in the child pornography he possessed on his two laptops.  If defense counsel is unable to reach settlement agreements with the victims' representatives by the time of sentencing, the government will request additional time to allow the parties to come to an agreement.

## VI.    Forfeiture

Pursuant to the Plea Agreement, the defendant has agreed to forfeit all interests in any child-pornography asset, including electronic devices seized from his residence on May 18, 2022.  The parties will submit a consent order of forfeiture at the sentencing hearing.

## CONCLUSION

The defendant's conduct was abhorrent and must be adequately punished.  He is a high risk to recidivate and poses a danger to the community.  Therefore, the United States requests that this Court sentence the defendant to 30 years of imprisonment and a lifetime of supervised release.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: July 17, 2024                     By:  _____/s/_____
                                             Lauren Halper
                                             Assistant United States Attorney
                                             United States Attorney's Office
                                             2100 Jamieson Avenue
                                             Alexandria, Virginia 22314
                                             Phone: (703) 299-3700
                                             Fax: (703) 299-3980
                                             Email: lauren.halper@usdoj.gov

                                             AND

                                             McKenzie Hightower
                                             Trial Attorney
                                             Child Exploitation and Obscenity Section
                                             Department of Justice
                                             Phone: (202) 215-7126
                                             Email: mckenzie.hightower2@usdoj.gov